**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | | |
|---|---|---|---|
| **UNTIED STATES OF AMERICA,** | ) | | |
| | ) | | |
| **Plaintiffs,** | ) | | |
| | ) | | |
| **v.** | ) | **NO.** | **07-20400-STA** |
| | ) | | |
| **KENNICE BROCK,** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |

_____

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**
_____

On December 18, 2007, the Defendant Kennice Brock was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Before the Court is the Defendant's May 27, 2008 Motion to Suppress all evidence that resulted from the search of Defendant's person conducted on November 1, 2006 (D.E. # 21). The United States has responded, and a hearing was held on August 14, 2008. This motion is now ripe for disposition. For the following reasons, the motion is DENIED.

**BACKGROUND**

At approximately 9:05 A.M. on November 1, 2006, Memphis Police Officer Carlos Foster encountered the Defendant Kennice Brock ("Defendant") in the high crime area of Silverage and Swift (Def.'s Mot. to Suppress 1).[1] Detective Foster, who recognized Defendant from a prior

---

[1]While neither the Motion to Suppress nor the Response state the exact time the incident occurred, at the hearing Officer Foster testified that the encounter occurred at approximately 9:05 A.M. Additionally, the government describes the area of Silverage and Swift as one of high-crime, which is supported by the testimony of Officer Foster, who stated that he had made many arrests in the area prior to the incident with Defendant.

arrest, observed Defendant exit his vehicle (*Id.*). Identifying each other by name, Detective

Foster engaged Defendant in a general discussion (Resp. to Def.'s Mot. to Suppress 1).[2]

Sometime in this interval Memphis Police Officer Kathy Stroud arrived on the scene,[3] and the

Detectives inquired as to whether Defendant was "in possession of any drugs or weapons," to

which Defendant responded "no" (Def.'s Mot. to Suppress 1).[4] Upon this inquiry Detective

Foster noted Defendant seemed nervous and began acting suspiciously (Resp. to Def.'s Mot. to

Suppress 2).[5] Defendant began walking towards his car,[6] when Detective Foster saw Defendant

reach toward the bottom of his pants "as if he were attempting to conceal something beside his

ankle" (Def.'s Mot. to Suppress 2).

---

[2]In their Motion and Response, neither party stated the reason for Detective Foster's presence in the area, but at the hearing, Detective Foster testified that after recognizing Defendant, he approached him to see if he was aware of any information regarding thefts in the neighborhood.

[3]Although the facts are largely uncontested, there does seem to be confusion surrounding the timing of Detective Stroud's arrival. Defendant's version of the facts places Detective Stroud's arrival after the initial encounter, but before Detective Foster's question about gun possession (Def.'s Mot. to Suppress 1), while the Government's version does not pinpoint a specific time of arrival (Resp. to Def.'s Mot. to Suppress 1).

[4]At the hearing Officer Foster testified that at some point the conversation was interrupted by an individual on a bicycle, although neither side mentioned this in its supporting memorandum.

[5]Detective Foster testified to Defendant's suspicious behavior at the hearing on this motion.

[6]Whether Defendant actually had reached his car by this point is unclear, as the Government places Defendant standing by his open car door (Resp. to Def.'s Mot. to Suppress 2), while Defendant places himself as still walking toward his car (Def.'s Mot. to Suppress 2); however, neither side seems to dispute that Defendant was on his way to his car.

Detective Stroud then detained Defendant and "conducted a pat down for officer safety" (*Id*. at 2).[7]  This pat-down search revealed a firearm concealed in Defendant's left shoe (*Id.*).  The Detectives placed Defendant under arrest and searched his vehicle where they discovered two .38 caliber bullets. (Resp. to Def.'s Mot. to Suppress 2).  The Detectives then transported Defendant to a secure location where he was advised of his rights and gave a statement admitting to possession of a firearm (Def.'s Mot. to Suppress 2).

<u>**ANALYSIS**</u>

The Sixth Circuit has identified three general types of permissible, warrantless encounters between the police and citizens: "(1) [T]he consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."[8]

I.      <u>The Initial Encounter</u>

The Supreme Court has stated that "even when officers have no basis for suspecting a particular individual [of criminal activity], they may generally ask questions of that individual, ask to examine that individual's identification, and request consent to search...-so long as the police do not convey a message that compliance with their requests is required."[9]  In other words, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of

_____

[7]At the hearing, Detective Foster further elaborated that Defendant would have been free to leave had he not reached for his ankle.

[8]*United States v. Waldon*, 206 F.3d 597, 602 (6th Cir.  2000).

[9]*Florida v. Bostick*, 501 U.S. 429, 434-35 (1991).

intimidating behavior that would lead a reasonable person to believe that [they were] not free to leave."[10]  Determining if an encounter is consensual must be based on the officer's objective behavior, not the officer's subjective suspicion of criminal activity.[11]  Additionally, an encounter that begins "as an attempt by the police to consensually obtain...information...[may] develop[] into circumstances in which an investigative detention [is] justified."[12]

For example in *United States v. Kimber*, a police officer twice approached a suspect and the suspect twice refused to speak with him.[13]  During a third attempt to engage in consensual discussion, the officer noticed the suspect's hand was in his pocket, and when the officer asked him to remove it, the suspect refused.[14]  At trial the officer, who knew the suspect prior to the incident, testified that he "had never seen him act so nervous."[15]  Here the court concluded that initially these encounters were consensual, and "the police did not have a reasonable basis upon which to detain or pat down [the suspect, but for] his refusal to remove his hand from his left jacket pocket together with his nervous behavior...."[16]

---

[10]*Waldon*, 206 F.3d at 603; *see also United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).

[11]*Davis*, 514 F.3d at 607 (*citing Waldon*, 206 F.3d at 584 ("We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing.")); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an idividual, the individual has a right to ignore the police and go about his business.").

[12]*United States v. Kimber*, 33 Fed. Appx. 717, 720 (6th Cir. 2002).

[13]*Id.*

[14]*Id.*

[15]*Id.*

[16]*Id.*

The initial encounter between Detective Foster and Defendant was a consensual encounter.[17] Because police officers may approach individuals without possessing any suspicion of criminal behavior to ask general questions, Detective Foster engaging Defendant in a general discussion can readily be classified as a consensual encounter.[18] Additionally, as Detective Foster's objective behavior was not coercive or intimidating, Defendant was free to leave at any point.[19] In fact Detective Foster testified that had Defendant not reached for his pant leg, as if to conceal something, he would not have detained him.[20]

II.     The Investigative Detention and Search

Investigative detentions, also known as a *Terry* "stop and frisk," are brief intrusions predicated on the policy that police officers investigating crimes should not be required to take unreasonable and unnecessary risks in the performance of their duties.[21] In *Terry*, the Supreme Court held that:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited

---

[17]*See Davis*, 514 F.3d at 607; *Kimber* 33 Fed. Appx. at 720.

[18]*See Waldon*, 206 F.3d at 603.

[19]*See Bostick*, 501 U.S. at 434-35.

[20]*See id.*

[21]*Terry v. Ohio*, 392 U.S. 1, 23 (1968).

search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.[22]

The fundamental inquiry under *Terry* is whether officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[23] Assessing whether an officer possesses particularized, objective suspicion requires a twofold analysis.[24] "First, the assessment must be based on the totality of the circumstances known to the officers at the time of the stop."[25] Under this "totality of the circumstances" rubric, officers may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[26] Second, this assessment must "arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime."[27] Reasonable suspicion must consist of more than an

---

[22]*Id.* at 30-31 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.").

[23]*United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

[24]*Id.* at 418.

[25]*Id.* (explaining that "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers" is just some of the "data, [from which] a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person").

[26]*United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (*citing Cortez*, 449 U.S. at 417-18).

[27]*United States v. Montero-Camargo*, 208 F.3d 1122, 1129-30 (6th Cir. 2000) (*citing Cortez*, 449 U.S. at 418).

"inchoate and unparticularized suspicion" or a "hunch" that criminal activity is afoot.[28]  However,

reasonable suspicion "is a less demanding standard than probable cause and requires a showing

considerably less than preponderance of the evidence."[29]

Although the Supreme Court has "deliberately avoided reducing [the reasonable suspicion

analysis] to a 'neat set of legal rules,'" there are several frequently recurring factors that may aid

in determining whether an officer possessed the requisite reasonable suspicion necessary to

conduct a *Terry* stop.[30]  The most frequently recurring factors utilized in the Sixth Circuit's

analysis include: (1) nervous/evasive behavior,[31] (2) furtive movements made in response to

---

[28]*Arvizu*, 534 U.S. at 274 (*citing Terry*, 392 U.S. at 27).

[29]*Wardlow*, 528 U.S. at 123 (*citing United States v.  Sokolow*, 490 U.S. 1, 7 (1989)); *see also Arvizu*, 534 U.S. at 273 ("Because the 'balance between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity [may be occurring]." (*quoting United States v. Brignoni-Ponce*, 422 U.S. 873, 818 (1975)).

[30]*Arvizu*, 534 U.S. at 274 (*quoting Ornelas v.  United States*, 517 U.S. 690, 696 (1996)).

[31]*United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (*citing United States v. Wardlow*, 528 U.S. at 124 (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion")); *see also United States v.  Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

police presence,[32] (3) the speed of a suspect's movements,[33] (4) presence in a high-crime area,[34] and (5) the time of day.[35]

In assessing these factors, the Sixth Circuit has warned against over generalization.[36] In particular, the court has stated "a 'high-crime' area factor is not [to be] used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but [should be] limited to specific circumscribed locations where particular crimes occur with unusual regularity."[37] The court suggested that the high-crime area factor should be limited (1) "to a specific intersection rather than an entire neighborhood," (2) to specific "crimes that frequently occur in the area," and (3) to frequently occurring crimes that relate to the reason the individual was stopped.[38] However, "officers are not required to ignore the relevant

---

[32]*Caruthers*, 458 F.3d at 466 (stating that "[f]urtive movements made in response to a police presence may also properly contribute to an officer's suspicion").

[33]*Id.* at 466 ("Given that simply walking away from the police does not give rise to reasonable suspicion, we agree that 'the speed of the suspect's movements may be relevant in the totality of the circumstances.'" (*quoting United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000)).

[34]*Id.* at 467-68.

[35]*United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (stating that a late hour may contribute to the analysis; however, 10:30 P.M. is "not late enough to arouse suspicion of criminal activity," while 1:00 A.M. may be).

[36]*See Caruthers*, 458 F.3d at 467.

[37]*Id.* (*quoting United States v. Montero-Camargo*, 208 F.3d at 1138 (stating that "'labeling an area high-crime raises special concerns of racial, ethnic, and socioeconomic profiling'")).

[38]*Id.* at 468.

characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[39]

For example, in *United States v. Pearce*, a pat-down search was found objectively based on reasonable suspicion, when a police officer in a marked cruiser, who was patrolling a known high-crime area, observed the Defendant exit his car, glance toward the officer, and then hunch over, while placing his right hand near the small of his back, as if to conceal a weapon.[40] Here, the furtive behavior in response to police presence coupled with an area of high-crime justified a finding of reasonable suspicion. In particular the court has noted that "[b]ending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved."[41] Thus, bending or leaning, "while susceptible to an innocent explanation…[may] be reasonably viewed as an attempt to conceal a weapon and/or other contraband material, such as narcotics…."[42]

Once an officer determines a *Terry* stop is necessary, he "may conduct 'a reasonable search for weapons...where he has reason to believe that he is dealing with an armed and dangerous individual.'"[43] However, if the individual subsequently is arrested or his vehicle is

---

[39] *Wardlow*, 528 U.S. at 124 (noting that the occurrence of an investigative stop in area of high-crime is a relevant contextual consideration in the *Terry* analysis).

[40] 531 F.3d at 382-83 (noting that a high crime area plus actions suggestive of carrying a gun may be the basis of reasonable suspicion; whereas, these factors alone may not).

[41] *Caruthers*, 458 F.3d at 467.

[42] *Pearce*, 531 F.3d at 382 (dicta).

[43] *Id.* at 380 (*quoting Terry*, 392 U.S. at 27) (alteration in original).

searched, the officer must possess probable cause that a criminal offense has or is being committed, based on the reasonable conclusions that he or she could draw from the facts known at that time.[44] Any evidence seized as the result of an unlawful search or arrest is inadmissible under the exclusionary rule, as is any evidence derivatively obtained from an unlawful search or arrest as "fruit of the poisonous tree."[45]

Based on the Rule laid out in *Terry*, and the Sixth Circuit's "reasonable suspicion" analysis, Detectives Foster and Stroud had an "objectively reasonable suspicion that 'his safety or that of others was in danger,'" when they conducted the pat-down search on Defendant.[46] Although Detectives and Defendant's initial interaction was consensual, the circumstances of the encounter quickly developed into a situation where safety necessitated a pat-down search based on the reasonable suspicion that Defendant possessed a weapon.[47]

First, Detective Foster had prior knowledge of the Defendant's criminal record, and in making a determination of reasonable suspicion, the officer's "own experience and specialized training" may be taken into consideration.[48] Second, Detective Foster noticed Defendant was acting nervously and may have concluded that Defendant's termination of their consensual encounter was somewhat evasive.[49] Third, while the incident's occurrence in an area of high-

---

[44]*Id.* (*citing Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

[45]*Id.* at 381 (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

[46]*Id.* at 382 (*quoting Terry*, 391 U.S. at 27).

[47]*See Terry*, 392 U.S. at 27; *Kimber*, 33 Fed. Appx. at 720.

[48]*See Terry*, 392 U.S. at 27.

[49]*See Caruthers*, 458 F.3d at 466 (*quoting Wardlow*, 523 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.")).

crime alone is not enough to find reasonable suspicion, when coupled with these other considerations, this factor should be included in the reasonable suspicion analysis.[50] Additionally, the Detectives use of a high-crime factor was sufficiently limited so as not to raise concerns regarding over generalization.[51] Fourth, Defendant's furtive movement towards the ankle of his pants may have been "reasonably viewed as an attempt to conceal a weapon."[52]

Although the 9:00 A.M. timing of the incident and Defendant walking away instead of fleeing may distinguish this case from others, based on the totality of the circumstances, the facts favor a finding of reasonable suspicion.[53] Thus, since Detectives Foster and Stroud possessed reasonable suspicion to conduct a *Terry* pat down search, the subsequent discovery of bullets in Defendant's vehicle and Defendant's subsequent admission of gun possession should not be excluded as "fruit of the poisonous tree."[54]

## CONCLUSION

---

[50]*See id.* ("Contextual considerations…may not without more, give rise to reasonable suspicion, [but] they are relevant to the reasonable suspicion calculus.")

[51]*See id.*

[52]*See Pearce*, 531 F.3d at 382; *see also Arvizu*, 534 U.S. at 227 ("A determination that reasonable suspicion exists…need not rule out the possibility of innocent conduct."); *Caruthers*, 458 F.3d at 464 ("Bending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved.").

[53]*See Blair*, 524 F.3d at 752 (stating that "a late hour may contribute to reasonable suspicion"); *Caruthers* 458 F.3d at 464-66 (noting that the speed of the suspect's movements is a factor to be considered).

[54]*See Pearce*, 531 F.3d at 381.

Because Detectives Foster and Stroud possessed a reasonable, particularized suspicion based on the totality of the circumstances that Defendant was armed and presently dangerous, Defendant's Motion to Suppress is **DENIED**.

IT IS SO ORDERED.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 11th, 2008.